# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| REBECCA L. GIBBONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:08CV 523 CAS(LMB) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Rebecca Gibbons for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 13). Defendant has filed a Brief in Support of the Adminis trative Decision and in Reply to the Plaintiff's Brief. (Doc. No. 16). Plaintiff has also filed a Reply to Defendant's Brief in Support of the Answer. (Doc. No. 17).

## Procedural History

On May 24, 2006, plaintiff filed her application for benefits, alleging that she became unable to work due to her disabling condition on March 1, 2005. (Tr. 28, 59, 67). On May 11, 2007, plaintiff filed another claim for Title II and Title XVI benefits, alleging an onset date of

disability of March 1, 2005.[1]  (Tr. 34-35, 67).  Following an administrative hearing, plaintiff's

claims were denied in a written opinion by an Administrative Law Judge (ALJ) on November 21,

2007.  (Tr. 22).  Plaintiff then filed a request for review of the ALJ's decision by the Appeals

Council, which was denied.  (Tr. 3-6).  Thus, the decision of the ALJ stands as the final decision

of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on October 25, 2007.  (Tr. 415).  Plaintiff was

present and was represented by counsel.  (Id.).  Vocational expert Jeff Magrowski was also

present.  (Id.).  The ALJ began the hearing by admitting the exhibits into the record.  (Tr. 417).

The ALJ then examined plaintiff, who testified that she was 22 years of age.  (Id.).

Plaintiff testified that she had graduated high school and attended one year of college.  (Id.).

Plaintiff stated that she had worked as a clerk in many different places, including Dollar Days,

Ozarkland, and Target.  (Tr. 417-18).  Plaintiff stated that some of her clerk experience was retail

oriented, but that she had also scheduled activities at a resort part-time.  (Tr. 418).  Plaintiff

testified that she has previously worked at a restaurant, a grocery store meat department, and a

factory.  (Id.).  The ALJ then noted that the only year plaintiff made any significant income was

2004.  (Id.).  Plaintiff indicated that she had worked several jobs during that year including

---

[1]Plaintiff's request for hearing based on her May 24, 2006 application was dismissed by
the Administrative Law Judge on procedural grounds on April 23, 2007.  (Tr. 67).  On June 13,
2007, the Appeals Council issued an order remanding the case to give plaintiff another
opportunity for a hearing and found that the subsequent claims were duplicate.  (Tr. 67-68).  The
ALJ in the present case dismissed the subsequent claims filed on May 11, 2007, and incorporated
the evidence from those subsequent claims into the remand file.  (Tr. 11).

Ozarkland, Target, and Snaps to Scraps. (Id.). The ALJ noted that plaintiff made over $5,000.00 at Snaps to Scraps. (Id.). Plaintiff stated that she was the only employee at this establishment. (Id.). Plaintiff testified that she worked there for four months as a retail clerk and cash register operator. (Tr. 418-19).

Plaintiff testified that her most recent place of employment was Convergy's, a tele-sales and tele-service company. (Id.). Plaintiff stated that she initially handled calls for Cingular, but that she was unable to handle the stress and workload of those calls. (Id.). Plaintiff stated that as a result of these problems, she had to be switched to handling calls for Citi Bank, helping people redeem awards and "things like that." (Id.).

Plaintiff testified that she quit working at Convergy's in June of 2006 because she became pregnant. (Id.). Plaintiff indicated that she experienced problems with the pregnancy due to being taken off of her medication. (Id.). Plaintiff stated that her pregnancy required multiple doctor visits. (Id.). Plaintiff testified that her pregnancy, coupled with her anxiety and stress level, caused her to be unable to handle her workload. (Tr. 419-20). She stated that her team leader always had to remove her from the phones and send her home. (Tr. 420). Plaintiff stated that she had experienced crying spells to the point she was unable to leave the bathroom. (Id.).

Plaintiff testified that she gave birth to a male child in December of 2006. (Id.). Plaintiff stated that she married the father of this child in February of 2007, having known him for two years. (Id.). Plaintiff stated that, at the time of the hearing, she lived with her husband and that she had no other children. (Id.).

Plaintiff testified that she was five feet, four inches tall and weighed 282 pounds, but that her normal weight was 255. (Id.). Plaintiff testified that she experiences back problems, and that

she had three bulging discs. (Tr. 421). Plaintiff stated that she experiences difficulty standing, sitting, lifting, and sleeping due to her back impairment. (Id.). Plaintiff testified that her doctor had placed restrictions on her. (Id.). She stated that she is unable to lift anything over twenty-five pounds, stand for longer than one hour, has to alternate between sitting and standing, must limit her exercise activities, and experiences severe problems sleeping. (Id.). Plaintiff testified that she takes medication for her sleeping problem. (Id.).

Plaintiff stated that Dr. Binbanron of the Advanced Pain Management Clinic in Farmington imposed these restrictions. (Id.). Plaintiff testified that she started receiving treatment there in September of 2007. (Id.). Plaintiff stated that she had been attempting to receive treatment at this clinic since February of 2007, but that issues arose with Medicaid. (Id.). She testified that she was still unable to receive physical therapy at the clinic due to issues with with Medicaid. (Id.). Plaintiff stated that she did not have any other physical problems that prevented her from working. (Id.).

Plaintiff testified that she had severe mental problems, which prevent her from working full-time. (Tr. 422). Plaintiff stated that she has extreme problems with anxiety and social anxiety. (Id.). Plaintiff testified that she gets so upset that she becomes sick and gets very dizzy. (Id.). Plaintiff stated that she often called in sick to work because she was depressed "to the point that I just want to crawl in a hole and I don't even want to be with anybody." (Id.). She testified that she has been hospitalized for severe depression and anxiety. (Id.). Plaintiff stated that she has problems going to the store by herself, and that she often needs her husband to go with her. (Id.). Plaintiff testified that she has problems taking care of her son as well. (Id.). She testified that her husband has not been able to work because he has to deal with her problems and

take care of their son.  (Id.).  Plaintiff stated that she had to go to the doctor every two to four weeks to change medications because of allergic reactions and side effects.  (Id.).  She testified that she had to visit a counselor every two to four weeks as well.  (Id.).

Plaintiff's attorney then examined plaintiff.  (Id.).  Plaintiff testified that she was sexually assaulted in March of 2005.  (Id.).  Plaintiff testified that at the time of the assault, she had been working at Bud Allen, a plastics factory.  (Tr. 423).  Plaintiff stated that she went to the home of a female co-worker one evening.  (Id.).  Plaintiff stated that three men were at this house, and that her friend eventually left her there to go to the store.  (Id.).  She testified that as she was getting ready to leave, the three men blocked her, two of them held her down, and one raped her.  (Id.).  Plaintiff testified that the she went to Lake Regional Hospital in Lake of the Ozarks, and she also reported the incident to the police.  (Id.).  She testified that the police were never able to solve the crime because all three men left town.  (Tr. 424).  Plaintiff stated that she had been experiencing significant issues with bipolar disorder and panic attacks even prior to this sexual assault.  (Id.).

Plaintiff testified that she had been employed at Dollar Days, a store owned by her mother, from April 2001 to April 2003.  (Tr. 425.).  Plaintiff testified that she experienced several problems while employed there.  (Id.).  Plaintiff stated that she took an overdose of medication on one occasion when she was depressed, which required hospitalization.  (Id.).  Plaintiff testified that she was also hospitalized due to a reaction to her medication, during which time she was unable to attend work.  (Id.).  Plaintiff stated that whenever she was severely depressed or "just couldn't take it" she would not attend work or school.  (Id.).  Plaintiff testified that her mother made her stay at home.  (Id.).  Plaintiff stated that she was being treated for her mental problems during this time.  (Id.).

Plaintiff testified that she worked at Tan-Tar-A from May of 2003 to July of 2003, as an activities desk attendant. (Tr. 426). Plaintiff testified that her responsibilities included dealing with customers and their activity needs. (Id.). Plaintiff stated that she had problems keeping up with the workload of dealing with multiple people at one time, and that she could not keep up or handle them being mad at her without breaking down. (Id.). Plaintiff testified that she would forget what she was doing and completely mess up. (Id.). Plaintiff recounted a particular time where she misplaced some money, ended up taking it, and had to provide an explanation. (Id.). She testified that her employer eventually terminated her because she could not fulfill her duties. (Id.).

Plaintiff testified that she had seasonal summer employment as a cashier at Ozarkland from May of 2002 to February of 2004. (Tr. 427). Plaintiff testified that she did not work much at this job, and that she always worked the night shift. (Id.). Plaintiff stated that as one of only two employees, she was required to deal with many people and tourists at one time. (Id.). Plaintiff testified that she initially performed fairly well at the position, but that she later developed anxiety with "just being there and [customers] getting mad at you." (Id.). Plaintiff testified that she also experienced anxiety with having to make sure the customers were not stealing. (Id.). Plaintiff testified that she called in sick at this position because her depression was severe and it was difficult to make herself go to work. (Tr. 428).

Plaintiff testified that contrary to testimony previously given, she worked at Snaps and Scraps from January of 2004 to August of 2004, a total of eight months rather than four months. (Id.). Plaintiff stated that she was laid off from this position because it was a struggling new business. (Tr. 428-29). Plaintiff testified that she experienced multiple problems at this position.

(Id.).  Plaintiff stated that she worked alone a lot, and that she became tired.  (Id.).  Plaintiff

testified that she had a problem with calling in sick, though she testified that she called in sick less

frequently here than she did at other places of employment.  (Id.).  Plaintiff stated that she had

problems keeping up with the workload including taking care of the computers and clients, and

putting out and rearranging the merchandise.  (Id.).

Plaintiff testified that she worked at Bali Playtex, a women's garment store, from July of

2004 to January of 2005.  (Tr. 430).  Plaintiff stated that she was laid off from this position

because she had difficulty fulfilling the duties of the position and coming into work on time.  (Id.).

Plaintiff testified that the reason she was unable to fulfill these duties was because of the legal

issues she was having at the time.  (Id.).  Plaintiff stated that she had been writing bad checks

because she was not on her medication.  (Id.).  Plaintiff testified that at the time, she had been

living with a man who was taking all her medication.  (Id.).  Plaintiff stated that she became so

depressed that she would call off work and go shopping.  (Id.).

Plaintiff testified that she was employed at Target from December of 2004 through

January of 2005.  (Tr. 431).  Plaintiff stated that she quit that job because the company threatened

to fire her if she missed another day of work for a doctor's appointment.  (Id.).  Plaintiff stated

that she went to the doctor's appointments because she injured her back while working at the

store.  (Id.).

Plaintiff testified that she worked in the seafood department of Hy-Vee, a grocery store,

from March 2005 through April of 2005.  (Id.).  Plaintiff stated that she called in sick to this

position because she was stressed and experienced anxiety.  (Tr. 432).  Plaintiff testified that she

quit this job because she did not understand what she was doing, everyone was frustrated with

her, and she was stressed.  (Id.).  Plaintiff testified that she worked at both Hy-Vee and Chili's at one point because she needed money for her legal problems.  (Id.).  Plaintiff stated that she eventually quit Hy-Vee.  (Id.).

Plaintiff testified that she worked at Chili's for three weeks.  (Id.).  Plaintiff testified that she lost this job because of the "intensity of dealing with six or seven tables at one time, orders, making sure you have everything, [and] the very fast pace."  (Id.).  Plaintiff testified that she could not handle these tasks.  (Id.).  Plaintiff testified that she was terminated from this position because she called in sick.  (Tr. 433).

Plaintiff testified that she worked at Bud Allen, a plastics factory, in May of 2005, for either a month or two weeks.  (Id.).  She testified that her anxiety was very high due to her legal problems and dealing with going back to jail.  (Id.).  Plaintiff stated that she was fired from that position because she was unable to meet the production requirements.  (Id.).

Plaintiff testified that she worked as a temporary cook at Penn Mack, a resort, in May of 2005, for one week.  (Tr. 433-34).  Plaintiff stated that she was terminated from this position because she missed one day of work.  (Id.).  Plaintiff testified that while she was waiting for another job, she ended up moving to St. Louis.  (Tr. 434)

Plaintiff testified that she worked at Everest Group, a door-to-door sales company in July of 2005.  (Id.).  Plaintiff stated that she was not prepared for this position.  (Id.).  Plaintiff testified that she was trying to do a different job she thought she could handle but that she was ultimately unable to meet the specific goals.  (Id.).  Plaintiff stated that her depression and anxiety were a factor in leaving this position.  (Tr. 435).

Plaintiff testified that she worked at a call center from February of 2006 to June of 2006. (Id.). Plaintiff stated that this started as a full-time position, but that she was later forced to take a pay cut with no more than twenty-five hours because she could not handle the sales. (Id.). Plaintiff stated that she began having problems with her pregnancy and anxiety because she was not receiving needed medications. (Tr. 435-36). Plaintiff testified that she began calling in sick. (Tr. 436). Plaintiff stated that her hours were further reduced to fifteen. (Id.). Plaintiff testified that she continued to experience problems causing the team leader to pull her off the phones, send her home, and write letters for her so she would not lose her job. (Id.)

Plaintiff testified that she had not performed any work since June of 2006. (Id.).

Plaintiff stated that she started taking Lithium[2] again two weeks after delivering her son. (Id.). Plaintiff stated that she was on Prozac[3] during her pregnancy, because it would not harm the baby as much, but that it was not the strongest or most effective medication. (Tr. 436-37).

Plaintiff testified that she was unable to work full-time because she has a lot of problems with stress and meeting goals. (Id.). Plaintiff stated that she experiences social anxiety with hot flashes, chest pains, and difficulty breathing. (Id.). Plaintiff testified that she cries a lot and she cannot handle stress and people. (Id.). Plaintiff testified that she experiences these kinds of anxiety attacks three to five times a week. (Id.). Plaintiff stated that she experiences these attacks many times throughout the day and that they last anywhere from thirty minutes to an hour. (Id.).

---

[2]Lithium is indicated for the treatment of manic episodes of manic-depressive illness. See Physician's Desk Reference (PDR), 1485 (59th Ed. 2005).

[3]Prozac is a psychotropic drug indicated for the treatment of major depressive disorder. See PDR at 1873.

Plaintiff stated that, during an anxiety attack, she secludes herself from other people. (Id.).  Plaintiff testified that she must constantly focus on breathing or she will pass out.  (Id.). Plaintiff testified that she tries to calm her breathing and "maybe put on some happy music to kind of keep me going."  (Id.).  Plaintiff stated that if the anxiety attack is particularly severe, she will call her mother.  (Id.).

Plaintiff testified that she usually sees a counselor, Shannon Sadlo, once every month.  (Tr. 438).  Plaintiff stated that she had been having problems meeting with Ms. Sadlo and that when this occurs, they talk on the phone.  (Id.).  Plaintiff testified that she had spoken with Ms. Sadlo four times.  (Id.).  Plaintiff testified that they talk about her daily activities, her problems and how she is handling them, and other things that are bothering her.  (Id.).  Plaintiff stated that Ms. Sadlo tries to help her find ways to deal with her problems.  (Id.).  Plaintiff testified that therapy has helped a lot.  (Id.).

Plaintiff testified that Dr. Sanjeev Rao has changed her medications four times because she had difficulty with them.  (Tr. 438-39).  Plaintiff stated that some medications will seem to work and then she will become immune.  (Id.).  Plaintiff stated that she was doing "pretty good" on her current medications.  (Id.).  Plaintiff testified that she hopes her current medications continue to work because changing medications stresses her out.  (Id.).

Plaintiff testified that she has been diagnosed with bipolar disorder.[4]  (Id.).  Plaintiff indicated that she generally experiences more depression, but that if she "let[s] it go too long" she

---

[4] A disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and within major depressive episodes.  See Stedman's Medical Dictionary, 568 (28th Ed. 2006).

becomes manic.  (Id.).   Plaintiff stated that she can recognize the signs of a manic episode from when she experienced a severe manic episode at the age of fifteen.  (Id.).

Plaintiff testified that out of a seven-day week, on average she experiences four bad days. (Tr. 440).  Plaintiff described a "bad day" with the following characteristics: not wanting to get out of bed, even when she hears her son cry; constantly in a down mood; no joking around; barely talking; when not crying, worrying or having anxiety attacks; keeping to herself; not wanting anyone to touch her; and not wanting anyone to deal with her.  (Id.).

Plaintiff stated on that on a "good day," she is very outgoing, she plays with her son, she does things with her husband, she associates with her husband's grandmother who lives with plaintiff, and she helps her husband's grandmother.  (Tr. 440-41).

Plaintiff testified that she usually remains at the house and does not go anywhere.  (Tr. 441).

Plaintiff testified that she has anger management issues, and that she lashes out when she becomes manic.  (Id.).  Plaintiff stated that she will tend more towards anger than crying, and that she pushes people away.  (Id.).  Plaintiff testified that these anger issues arise occasionally, but that she tries to control them.  (Id.).  Plaintiff stated that these issues arise when she cannot "catch her bipolar" or her depression.  (Tr. 442).  Plaintiff testified that this is the beginning stage of her manic phase.  (Id.).  Plaintiff testified that when her condition worsens, she hurts herself and tears things up.  (Id.).  Plaintiff stated that when she experiences one of these episodes, she just wants people to leave her alone.  (Id.).

The ALJ then asked the vocational expert, Jeff Magrowski, if he would like to question plaintiff.  (Id.).  The vocational expert asked plaintiff if she had performed plastic assembly.  (Id.).  Plaintiff testified that she had performed such work for about two weeks.  (Id.).

The ALJ then questioned Mr. Magrowski.  (Id.).  The ALJ asked Mr. Magrowski to assume a hypothetical individual, age twenty at the alleged date of onset of disability, with thirteen years of education and the same work experience as plaintiff.  (Tr. 442-43).  The ALJ stated that the individual would be able to lift and carry up to twenty pounds occasionally, ten pounds frequently, stand or walk for six hours out of eight, sit for six hours out of eight, occasionally climb stairs and ramps, never climb ropes, ladders and scaffolds, and must avoid concentrated exposure to vibration and the hazards of unprotected heights.  (Tr. 443).  The ALJ stated that the hypothetical individual would be able to understand, remember, and carry out at least simple instructions and non-detailed tasks.  (Id.).  Mr. Magrowski testified that this individual would be able to perform plaintiff's past cashier work.  (Id.).  Mr. Magrowski stated that his testimony was consistent with the DOT and his experience. (Id.).

Plaintiff's attorney then asked Mr. Magrowski to assume a hypothetical individual consistent with the testimony given by the plaintiff.  (Id.).  Plaintiff's attorney stated that this individual would have the following limitations:

> four days out of seven that were considered bad, she'd be depressed
> most of those days, she'd have three to five panic attacks per week,
> which would last anywhere from 30-to-60 minutes attacks which
> would prevent her from doing whatever work she was doing at the
> time, that would also have difficultly dealing with any kind of
> stress-induced work having to meet goals, numbers, you know, in an
> assembly line situation where she had to put certain amounts of output,
> dealing with people on a frequent basis would be difficult so she
> wouldn't be able to do that.

(Tr. 443-44). Mr. Magrowski stated that the individual would not be able to perform any of plaintiff's past work or any other work. (Id.).

## B.  **Relevant Medical Records**

The record reveals that plaintiff presented to the emergency room at Lake Regional Medical Center on four occasions from July 2, 2004, through July 11, 2004, complaining of an injury to the right middle finger. (Tr. 301-310). On July 12, 2004, plaintiff presented to the emergency room with complaints of sharp abdominal pain and nausea. (Tr. 296). The impression of the examining physician was acute abdominal pain and vertigo. (Tr. 295). Plaintiff was prescribed medication and was released the same day. (Tr. 294).

Plaintiff presented to the emergency room at Lake Regional Medical Center on July 25, 2004, with complaints of back pain. (Tr. 293). Plaintiff stated that she injured her back while pushing carts. (Id.). The impression of the examining physician was acute myofascial strain[5] of the lumbar back and acute lower back pain. (Tr. 292). Plaintiff was prescribed Darvocet.[6] (Id.).

Plaintiff presented to the emergency room at Lake Regional Medical Center on July 28, 2004, with complaints of continuing moderate to severe back pain. (Tr. 288). The impression of the examining physician was acute lower back pain. (Tr. 287). Plaintiff was prescribed Demerol[7] and Phenergan.[8]

---

[5]Of or related to the fascia surrounding and separating muscle tissue. See Stedman's at 1272

[6]Darvocet is indicated for the relief of mild to moderate pain. See PDR at 402.

[7]Demerol is indicated for the relief of moderate to severe pain. See PDR at 2988.

[8]Phenergan is indicated for control of post-operative pain. See PDR at 3362.

Plaintiff presented to the emergency room at Lake Regional Medical Center on July 31, 2004, complaining of continuing severe back pain. (Tr. 285). The impression of the examining physician was acute lower back pain. (Tr. 284).

Plaintiff presented to the emergency room at Lake Regional Medical Center on August 4, 2004, complaining of an injury to the neck and chest as the result of a motor vehicle accident. (Tr. 276). Plaintiff also complained of pain in the left shoulder, left arm, left elbow, and left forearm. (Id.). Plaintiff did not allege any back pain according to the record. (Id.). The impression of the examining physician was a contusion, unremarkable with no specific abnormalities in the bones and soft tissue. (Tr. 275, 277). With regard to the neck and spine, plaintiff was diagnosed with strain without evidence of swelling, fracture, or dislocation. (Tr. 278). With respect to the left shoulder, plaintiff was diagnosed with a contusion with no evidence of fracture. (Tr. 275, 281). Plaintiff was prescribed Vicodin[9] and other medications and released in stable condition later the same day. (Tr. 274).

Plaintiff presented to the emergency room at Lake Regional Medical Center on October 6, 2004, complaining of an injury to the left bend of the index finger. (Tr. 270). The impression of the examining physician was laceration of the left hand. (Tr. 269).

Plaintiff presented to the emergency room at Lake Regional Medical Center on November 20, 2004, complaining of constant abdominal pain. (Tr. 260). The impression of the examining

---

[9]Vicodin is indicated for the relief of moderate to moderately severe pain. See PDR at 528.

physician was acute abdominal pain and urinary tract infection. (Tr. 259). Plaintiff was

prescribed Toradol[10] and Cipro,[11] and released in improved condition. (Tr. 258).

Plaintiff presented to the emergency room at Lake Regional Medical Center on January

10, 2005, complaining of severe pelvic and abdominal pain. (Tr. 253). The impression of the

examining physician was acute pelvic pain. (Tr. 252). Plaintiff presented to the emergency room

on January 26, 2005, complaining of continuing abdominal pain. (Tr. 246). The impression of

the examining physician was pelvic pain with need for follow-up lab results and diagnosis. (Tr.

245).

Plaintiff underwent a pelvic ultrasound at Lake Regional Medical Center on February 10,

2005, which was normal. (Tr. 243).

Plaintiff presented to the emergency room at Lake Regional Medical Center March 23,

2005, complaining of pain and tingling in her right hand. (Tr. 241). Plaintiff claimed that she felt

the pain at work. (Id.). The impression of the examining physician was a contusion of the right

hand. (Tr. 240). It was noted that no fracture or dislocation was present. (Tr. 242).

Plaintiff presented to the emergency room at the Lake Regional Medical Center on April

10, 2005, complaining of severe elbow pain. (Tr. 237). Plaintiff stated that she had slipped on a

wet floor at work, fell, and struck her elbow. (Id.). The impression of the examining physician

was contusion of the right elbow but no fracture. (Tr. 236, 239).

---

[10]Toradol is a non-steroidal anti-inflammatory drug indicated for the short-term
management of moderately severe acute pain that requires analgesia at the opioid level. See PDR
at 2932-2934.

[11]Cipro is indicated for the treatment of bacterial infections. See PDR at 822.

Plaintiff was admitted to the Lake Regional Medical Center on April 20, 2005, with complaints of suicidal thoughts of driving off a cliff. (Tr. 229). Plaintiff reported that she had quit taking her Lithium for her bi-polar disorder. (Tr. 220). Plaintiff stated that she had been having problems with her family as well as legal issues, and that a big part of her problem was her failure to take her medications. (Id.). Plaintiff also stated that she did not, and would not, harm herself. (Id.). Angela Clay, D.O., noted that plaintiff was prescribed Lithium, Effexor,[12] and Abilify,[13] but that she had been neglecting to take these medications. (Id.). Dr. Clay's assessment was bi-polar disorder and suicidal ideations. (Tr. 221). Dr. Clay advised plaintiff to restart her medications. (Id.).

Plaintiff presented for a psychiatric consultation with Dr. Bhaskar Y. Gowda at Lake Regional Medical Center on April 21, 2005, with complaints of suicidal thoughts and depression. (Tr. 222). Plaintiff reported that she had been suffering from bi-polar disorder for almost ten years. (Id.). Plaintiff indicated that she had stopped taking her medications, which included Lithium, Abilify, and Effexor. (Id.). Plaintiff stated that she experienced severe moods swings where she becomes irritable, angry and upset one minute, and the next minute she cries. (Id.). Plaintiff also complained of problems with sleeping, lack of interest in things, increased feelings of guilt, too much energy, too little energy, racing thoughts, severe anxiety, and panic attacks. (Id.). Plaintiff also complained of stress stemming from her legal problems. (Id.). Dr. Gowda noted a previous admission to St. Anthony's Hospital when plaintiff was fifteen for severe suicidal

---

[12]Effexor is indicated for the treatment of major depressive disorder. See PDR at 3321.

[13]Abilify is a psychotropic drug indicated for the treatment of schizophrenia. See PDR at 1026-27.

ideations.  (Id.).  Dr. Gowda stated that plaintiff had a long history of cutting her wrists, which

she continued to do, and that plaintiff had made one serious suicide attempt by cutting her wrists.

(Id.).  Dr. Gowda noted that plaintiff had a good working relationship with her psychiatrist, that

she had tried all possible antidepressant and antipsychotic medication, and that she was recently

well-stabilized with Abilify, Lithium, and Effexor.  (Id.).  Dr. Gowda's assessment was bipolar

affective disorder with a recent episode of depression, generalized anxiety disorder,[14] panic

disorder,[15] and borderline personality traits.  (Tr. 225).  Dr. Gowda assessed a GAF score of 45.[16]

[17]  (Id.).  He recommended that plaintiff restart her medications, and that she receive a psychiatric

follow-up.  (Id.).

Plaintiff presented to the emergency room at Lake Regional Medical Center on May 7,

2005, with complaints of pain in her left wrist.  (Tr. at 217-19).  The impression of the examining

physician was superficial injury.  (Id.).

---

[14]Chronic, repeated episodes of anxiety reactions; a psychological diagnosis in which anxiety or morbid fear and dread accompanied by autonomic changes are predominant features. Stedman's at 569.

[15]Recurrent panic attacks that occur unpredictably.  Stedman's at 570.

[16]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[17]A GAF score of 41 to 50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job." DSM-IV at 32.

Plaintiff presented to the emergency room at Lake Regional Medical Center on May 12, 2005, with complaints of nausea, dizziness, and shaking. (Tr. 214-216). Plaintiff admitted to taking seven caffeine pills earlier in the day and claimed to be addicted to caffeine pills. (Id.). The impression of the examining physician was gastric caffeine ingestion. (Id.).

Plaintiff presented to the emergency room at Lake Regional Medical Center on June 14, 2005, with complaints of constant abdominal pain. (Tr. 206-08). The impression of the examining physician was acute abdominal pain. (Id.).

Plaintiff was admitted to St. Anthony's Medical Center on February 7, 2006, with complaints of depression and inability to function. (Tr. 321, 323). Ahmad B. Ardekani, M.D. stated that plaintiff had previously been diagnosed with bipolar disorder and depression. (Tr. 323). Dr. Ardekani's diagnosis was bipolar disorder with psychotic features. (Id.). Dr. Ardekani noted that plaintiff had been treated with Lexapro,[18] Abilify, and Wellbutrin,[19] and achieved positive results. (Tr. 324). Plaintiff reported that she had discontinued taking her medication because she had been pregnant. (Tr. 323). Plaintiff stated that she had recently miscarried. (Tr. 326). Dr. Ardekani noted that plaintiff exhibited suicidal thoughts, increasing depression, moodiness, and irritability. (Id.). Dr. Ardekani assessed a GAF score of 30. [20] (Tr. 325). Dr.

---

[18]Lexapro is indicated for the treatment of major depressive disorder. See PDR at 1282.

[19]Wellbutrin is indicated for the treatment of depression. See PDR at 1656.

[20]A GAF of 21 to 30 denotes behavior that is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). DSM-IV at 34.

Ardekani recommended that plaintiff resume taking Wellbutrin and Abilify to treat her bipolar disorder. (Id.). Plaintiff was discharged on February 10, 2006. (Id.).

Plaintiff presented for a psychiatric evaluation with Dr. Poyanil Mathew on February 28, 2006. (Tr. 340). Plaintiff stated that she was experiencing legal problems stemming from writing bad checks, she was currently on probation, and that she had spent a week in jail. (Id.). Plaintiff gave a history of mental illness in the family including grandmothers on both sides suffering from bipolar disorder, a father that had suffered depression, and several other family members that suffered from depression. (Id.). Plaintiff stated that she was mostly tired in the mornings, her appetite was not very good, her weight was a problem, and that she was not currently doing any exercise. (Id.). Plaintiff admitted to crying during the day and night, and that she often felt better after crying. (Id.). Plaintiff stated that she did not feel helpless or hopeless, but that she felt guilty about past actions. (Id.). Plaintiff stated that she had attempted suicide in the past, but that she had mostly done it for attention. (Id.). Plaintiff stated that she sometimes had excessive energy, thought racing, and pressure of thought. (Id.). Plaintiff stated that she had periods during which she would spend money and go shopping. (Id.). Plaintiff admitted that when she is depressed, she isolates herself, cries, does not go to work, and has previously attempted to hurt herself. (Id.). Plaintiff stated that Lithium and Wellbutrin were the most effective medications she had taken. (Id.). Plaintiff stated that she was planning on getting married, and denied Dr. Mathew's offer of a mood stabilizer because she did not want to harm a fetus. (Tr. 342). Dr. Mathew diagnosed plaintiff with bipolar affective disorder (mixed type), panic attacks, and rule

out major depressive disorder.[21]  (Id.).  Dr. Mathew assigned a GAF score of 50.  (Id.).  Dr. Mathew recommended that plaintiff start an exercise program, see a dietician, watch her diet, and continue to see a therapist.  (Id.).  Dr. Mathew continued plaintiff on Wellbutrin and Abilify.  (Id.).

Plaintiff presented for a follow-up with Dr. Mathew on March 27, 2006.  (Tr. 339).  Dr. Mathew noted that plaintiff was well-dressed, well-groomed, pleasant, alert and oriented.  (Id.).  Plaintiff stated that she was working in a call center forty hours a week and doing fairly well.  (Id.).  Plaintiff stated that she was somewhat depressed and denied having any recent manic episodes.  (Id.).  Plaintiff expressed reservations about taking mood stabilizers, as she sought to become pregnant.  (Id.).  Plaintiff stated that she was sleeping five to six hours a night, and admitted to some crying episodes and feelings of hopelessness and helplessness.  (Id.).  Plaintiff denied any feelings of guilt or suicidal tendencies.  (Id.).  Dr. Mathew's assessment was mixed type bipolar depressive disorder, panic attacks, and rule out major depressive disorder.  (Id.).  Dr. Mathew assessed a GAF score of 65.[22]  (Id.).  Dr. Mathew also noted plaintiff had been in an auto accident with minor burns.  (Id.).  Dr. Mathew recommend that plaintiff continue to exercise, watch her diet, and start Wellbutrin and Abilify.  (Id.).

Plaintiff presented for a follow-up with Dr. Mathew on May 9, 2006.  (Tr. 337).  Plaintiff reported being two-and-one-half months pregnant.  (Id.).  Dr. Mathew and plaintiff discussed the

---

[21]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness.  Stedman's at 515.

[22]A GAF score of 61-70 denotes "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV at 32

risks treating her depression posed on the fetus. (Id.). Plaintiff expressed a fear of not treating her depression due to her past experience with severe depression. (Id.). Dr. Mathew noted that Lithium was not an option due to the pregnancy. (Id.). Dr. Mathew discontinued the Wellbutrin and Abilify, and started plaintiff on a dose of Prozac. (Id.). Dr. Mathew noted that plaintiff was seeing a physical therapist and was taking Flexeril[23] for treatment of whiplash that occurred during an auto accident. (Id.). Plaintiff denied any suicidal tendencies, and admitted to crying and feeling helpless but not hopeless. (Id.). Dr. Matthew assessed a GAF score of 65. (Tr. 338). Dr. Matthew diagnosed plaintiff with recurrent major depressive disorder and rule out mixed type bipolar depressive disorder. (Id.). Dr. Mathew recommended that plaintiff continue to exercise and watch her diet. (Id.).

Plaintiff presented to Dr. Mathew on May 22, 2006, at which time plaintiff reported that her condition had improved somewhat, she was able to relax, and her depression was less severe. (Tr. 336). Plaintiff stated that she still experienced anxiety. (Id.). It was noted that plaintiff experienced some interrupted sleep, some crying episodes and some feelings of hopelessness or helplessness; but she experienced no feelings of guilt, suicidal tendencies, or auditory or visual hallucinations. (Id.). Dr. Matthew noted that plaintiff was working forty hours a week at the call center and that plaintiff was "happy about that." (Id.). Dr. Mathew diagnosed plaintiff with bipolar affective disorder, mixed type; and rule out major depressive disorder. (Id.). Dr.

---

[23]Flexeril is indicated for the relief of muscle spasm associated with acute, painful musculoskeletal conditions. See PDR at 1931.

Matthew assessed a GAF score of 55.[24]  (Id.).  Dr. Mathew recommended that plaintiff continue on a regimen of diet, exercise, and Prozac. (Id.).

Plaintiff received treatment from psychiatrist Sanjeev Rao, M.D., at St. Anthony's Behavioral Health Group, from November 16, 2006, through September 24, 2007.  (Tr. 360-410).  On November 16, 2006, plaintiff reported a long history of bipolar affective disorder and that she had a recent depressive episode that was adequately treated with Prozac.  (Tr. 393).  Plaintiff reported that she had been treated with Lithium for maintenance of her bipolar disorder, but that she had discontinued taking Lithium during her pregnancy.  (Id.).  Plaintiff was thirty-seven weeks pregnant at the time of this visit.  (Id.).  Dr. Rao reported that plaintiff was calm, cooperative, and obese, and that her thought flow and content were within normal limits.  (Tr. 394).  Dr. Rao noted that she had no suicidal ideations and that her insight and judgment were fair.  (Id.).  Dr. Rao diagnosed plaintiff with bipolar affective disorder by history and reported a recent episode of depression.  (Id.).  Dr. Rao assessed a GAF score of 50.  (Id.).  He continued plaintiff on Prozac, and noted that plaintiff should consider re-starting Lithium after her pregnancy.  (Id.).  Dr. Rao also recommended that plaintiff continue to receive therapy from Shannon Cooper Sadlo.  (Id.).

Plaintiff presented to Dr. Rao on November 20, 2006, at which time she reported compliance with taking her Prozac.  (Tr. 385).  Plaintiff expressed a desire to restart Lithium after her pregnancy.  (Id.).  Dr. Rao diagnosed plaintiff with bipolar affective disorder, with a GAF

---

[24]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficult in social, occupational, or school functioning (e.g., few friends, conflicts with peer or co-workers)."  DSM-IV at 32.

score of 55-60.  (Id.).  Dr. Rao recommended that plaintiff continue on Prozac and continue seeing Shannon Sadlo for therapy.  (Id.).

Plaintiff presented to Dr. Rao on December 29, 2006, at which time she reported that she had given birth two-and-one-half weeks prior, and that she was not breast-feeding.  (Tr. 384).  Plaintiff reported no manic episodes.  (Id.).  Dr. Rao noted that plaintiff was calm and cooperative, and that her mood was good.  (Id.).  Dr. Rao continued plaintiff on Prozac and resumed the Lithium.  (Id.).

Plaintiff presented to Dr. Rao on January 15, 2007, at which time she reported that her mood was good and that she was sleeping "alright."  (Tr. 383).  Dr. Rao noted that plaintiff was calm and cooperative.  (Id.).  Dr. Rao continued plaintiff on Prozac and Lithium, and recommended that she continue therapy with Shannon Sadlo.  (Id.).

Plaintiff presented to Dr. Rao on February 12, 2007, at which time she reported that her mood and sleep were good.  (Tr. 382).  Dr. Rao stated that plaintiff was making progress in therapy with Ms. Sadlo.  (Id.).  Dr. Rao noted that plaintiff was calm and cooperative.  (Id.).  Dr. Rao continued plaintiff on the Prozac and Lithium.  (Id.).

Plaintiff attended a counseling session with Shannon Sadlo, MSW, LCSW, on February 12, 2007.  (Tr. 358).  Plaintiff reported an increase in feelings of sadness due to the upcoming anniversary of her father's suicide.  (Id.).  Plaintiff reported that she would be getting married in two days.  (Id.).  Plaintiff indicated that her fiancé had relapsed with methamphetamine, but he had stopped again when she left him.  (Id.).  Plaintiff reported an improvement in her relationship with her fiancé.  (Id.).

Plaintiff presented to Dr. Rao on April 3, 2007, at which time she reported worsening depression, severe mood swings, crying spells, anxiety, decreased appetite, and mood swings. (Tr. 381). Plaintiff also reported that she had not received therapy with Ms. Sadlo since February 12, 2007. (Id.). Dr. Rao noted that plaintiff's mood was depressed, and that she was calm and cooperative. (Id.). Dr. Rao assessed a GAF score of 40.[25] (Id.). Dr. Rao continued patient on Lithium and increased her dosage of Prozac. (Id.).

Plaintiff attended a counseling session with Ms. Sadlo on April 3, 2007. (Tr. 358). Plaintiff reported an increase in depression symptoms and anxiety. (Id.). Plaintiff denied any thoughts of harm to herself or others. (Id.).

Plaintiff presented to Misty Shaw, RNBCFNP, on April 4, 2007, with complaints of lower back pain. (Tr. 351). Plaintiff stated that she experienced tingling in both her legs and tingling in her arms she thought may be related to her Lithium. (Id.). Ms. Shaw noted that x-rays of plaintiff's lumbar spine showed increased lordosis[26] and mild L4-L5 degenerative joint disease.[27] (Id.). Ms. Shaw stated that x-rays of plaintiff's thoracic spine revealed mild multilevel

---

[25] A GAF score 31 to 40 denotes "[i]mpairments in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up other children, is defiant at home, and is failing at school." DSM-IV at 32

[26] An anteriorly convex curvature of the vertebral column. Stedman's at 1119.

[27] Degenerative joint disease, or osteoarthritis, is characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

degenerative spondyloses.[28]  (Id.).  Ms. Shaw recommended an MRI of the lumbar spine.  (Id.).

The MRI revealed left posterolateral T11-12 disc herniation and mild disc bulges at L4-5 and L5-

S1.  (Tr. 353).

Plaintiff presented to Dr. Rao on April 18, 2007, at which time Dr. Rao noted that

plaintiff's depression seemed improved.  (Tr. 380).  Plaintiff reported a decrease in crying, an

increase in anxiety, an increase in appetite, and a decrease in sleep.  (Id.).  Dr. Rao noted that

plaintiff was calm and cooperative and that her mood was better.  (Id.).  Dr. Rao recommended

that plaintiff continue with the Prozac and Lithium and that she continue to receive therapy with

Ms. Sadlo.  (Id.).

Plaintiff presented to Dr. Rao on May 8, 2007, at which time she reported that her

depression was the same or worse.  (Tr. 379).  Plaintiff reported increased anxiety.  (Id.).  Plaintiff

stated that her bipolar affective disorder had been worse the prior two to three months.  (Id.).

Plaintiff indicated that she had been attending therapy with Ms. Sadlo.  (Id.).  Dr. Rao assessed a

GAF score of 40.  (Id.).  Dr. Rao noted that plaintiff was calm and cooperative, and that her

mood was the same or worse.  (Id.).  Dr. Rao continued the Lithium and increased her dosage of

Prozac.  (Id.).  Dr. Rao encouraged plaintiff to see Ms. Sadlo for therapy.  (Id.).

Plaintiff attended a counseling session with Ms. Sadlo on June 5, 2007.  (Tr. 358).

Plaintiff denied any current symptoms but reported bouts of extreme depression.  (Id.).  Ms. Sadlo

noted that plaintiff and her husband were experiencing severe psychosocial stressors and

---

[28]Bony changes seen around the vertebral bones such as are found in degenerative disc
disease.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:201 (1993).

relationship issues.  (Tr. 357).  Plaintiff stated that her husband had begun using drugs again, and that he was verbally aggressive.  (Id.).

Plaintiff presented to Dr. Rao on June 6, 2007, at which time she reported that her mood was not so good, she had increased daily crying spells, her appetite was better, and her energy was improved.  (Tr. 377-78).  Dr. Rao assessed a GAF score of 45.  (Id.).  Dr. Rao noted that plaintiff was not responding well to her medications.  (Id.).  Plaintiff was advised that she could discontinue Prozac  (Id.).  Dr. Rao started plaintiff on Seroquel.[29]  (Id.).

Kenneth R. Smith, M.D., a neurosurgeon at St. Louis University, examined plaintiff on June 14, 2007.  (Tr. 345).  Plaintiff reported a six-month history of sharp upper and lower back pain, numbness and tingling in the bilateral upper and lower extremities, and sharp pains down the legs.  (Id.).  Dr. Smith noted that plaintiff gave birth in December of 2006 with an epidural.  (Id.).  Plaintiff stated that the pain had been severe since this time.  (Id.).  Plaintiff stated that she could not stand for longer than five minutes, had difficulty lifting her twenty to twenty-five pound baby, and sometimes had difficulty getting out of bed.  (Id.).  Dr. Smith found that plaintiff could move all of her extremities equally, her gait was steady, and she had full strength.  (Id.).  Dr. Smith's assessment was upper and lower back pain with no disc herniation seen on MRI.  (Id.).  Dr. Smith stated that plaintiff did not have a surgical issue, and recommended pain management.  (Id.).

Plaintiff presented to Dr. Rao on July 5, 2007, at which time she reported excessive sedation, and that she was sleeping too well.  (Tr. 376).  Plaintiff stated that her mood was better, and that her appetite and energy were fairly well.  (Id.).  Dr. Rao assessed a GAF score of 50.

---

[29]Seroquel is a psychotropic drug indicated for the treatment of bipolar mania.  See PDR at 662-63.

(Id.).  Dr. Rao decreased plaintiff's dosage of Seroquel, and advised plaintiff to continue seeing Ms. Sadlo for therapy.  (Id.).

Dr. Rao authorized a refill of plaintiff's prescription for Lithium on August 1, 2007.  (Tr. 375).

Plaintiff presented to Dr. Rao on August 2, 2007, at which time she reported marital problems.  (Tr. 374).  Plaintiff stated that an argument with her husband had escalated and that he had hit the wall next to her head.  (Id.).  Plaintiff reported that her mood was "really bad" and that she had been experiencing anxiety over the marital problems.  (Id.).  Plaintiff also reported an increase in crying spells.  (Id.).  Dr. Rao assessed a GAF score of 45.  (Id.).  Dr. Rao referred plaintiff to couples counseling.  (Id.).

Plaintiff attended a counseling session with a substitute counselor for Ms. Sadlo on August 8, 2007.  (Tr. 356).  The counselor noted that plaintiff stayed at home while her husband earned money for the household.  (Id.).  Plaintiff stated that she was experiencing a lot of stress.  (Id.).  Plaintiff stated that her husband previously manufactured methamphetamine and that he was tempted to restart in order to make money.  (Id.).  The counselor suggested techniques that plaintiff and her husband could practice to avoid anger issues.  (Id.).

Plaintiff presented to Dr. Rao on August 28, 2007, at which time Dr. Rao noted that plaintiff had discontinued taking Seroquel due to the sedative effects.  (Tr. 372).  Plaintiff complained of increased irritability, picking at her face, crying spells in the context of marital conflict, anxiety, forgetfulness and anhedonia.  (Id.).  Plaintiff reported that she had not received marital counseling with her husband.  (Id.).  Plaintiff stated that her mood was "up and down." (Id.).

On September 24, 2007, Dr. Rao prescribed Lithium and Lamictal.[30]  (Tr. 391).

In a letter to plaintiff's attorney dated September 27, 2007, Ms. Sadlo stated that plaintiff had been seeking counseling for issues related to her bipolar disorder.  (Tr. 412).  Ms. Sadlo stated that she had arrived at the conclusion through treatment that plaintiff was unable to maintain full-time employment.  (Id.).  Ms. Sadlo stated that the plaintiff suffered from bouts of severe depression and anxiety, which were directly related to her bipolar disorder.  (Id.).  She indicated that plaintiff was employed briefly in 2006, but was unable to manage the requirements and was required to resign.  (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant attained age 22 on June 11, 2007, the day before her 22nd birthday (20 CFR 404.102 and 416.120(c)(4)); the claimant has insured status through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since March 1, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

3. Since March 1, 2005, the alleged onset date of disability, the claimant has had the following severe impairments: degenerative disc disease of the thoracic and lumbar spine: obesity; bipolar disorder with depression (not otherwise specified) (20 CFR 404.1520(c) and 416.920(c)).

4. Since March 1, 2005, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that, since March 1, 2005, the claimant has had the residual functional capacity to do

[30]Lamictal is an antiepileptic drug indicated for the treatment of bipolar disorder.  See PDR at 1533.

the following: occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; sit 6 hours in an 8-hour workday; stand/walk 6 hours in an 8-hour workday; occasionally climb stairs and ramps; never climb ropes, ladders, and scaffolds; avoid concentrated exposure to hazards of heights; avoid concentrated exposure to vibration; and she is able to understand, remember, and carry out at least simple instructions.

6.     At all times relevant to this decision, the claimant has been able to perform past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant has not been under a disability as defined in the Social Security Act, since March 1, 2005 (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

(Tr. 13-15, 21).

The ALJ's final decision reads as follows:

Based on the applications filed on May 24, 2006, for a period of disability, disability insurance benefits, and disabled adult child's benefits, the claimant was not disabled as defined in sections 216(I) and 223(d) of the Social Security Act prior to June 11, 2007, the date she attained age 22.

Based on the application for supplemental security income filed on March 24, 2006, the claimant is not disabled as defined in section 1614(a)(3)(A) of the Social Security Act.

(Tr. 22).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.

See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See

20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of

medical findings and the rating of functional loss against the paragraph A and B criteria of the

Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the

impairment does not meet or equal the listings, then the Commissioner must prepare a residual

functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional

capacity.  Plaintiff also argues that the ALJ erred in failing to make findings regarding the physical

and mental demands of plaintiff's past work.  The undersigned will address plaintiff's claims in

turn.

## 1.    Residual Functional Capacity

Plaintiff argues that the ALJ erred in determining her residual functional capacity.

Specifically, plaintiff claims that the ALJ failed to provide a narrative discussion of the rationale

for his determination, and that the determination is not supported by the medical evidence.

Determination of residual function capacity is a medical question and at least "some

medical evidence 'must support the determination of the claimant's [residual functional capacity]

and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the

workplace.'"  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel,

245 F.3d 700, 704 (8th Cir. 2001).  Further, determination of residual functional capacity is "based

on all the evidence in the record, including 'the medical records, observations of treating

physicians and others, and an individuals' own description of his limitations.'"  Krogmeier v.

Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863

(8th Cir. 2000).  Similarly, in making a finding of residual function capacity, an ALJ may consider

non-medical evidence, although the residual functional capacity finding must be supported by

*some* medical evidence.  See Lauer, 245 F.3d at 703.

The ALJ made the following determination regarding plaintiff's residual functional

capacity:

> [a]fter careful consideration of the entire record, the undersigned finds that, since March
> 1, 2005, the claimant has had the residual functional capacity to do the following:
> occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; sit 6 hours in an
> 8-hour workday; stand/walk 6 hours in a an 8-hour workday; occasionally climb stairs
> and ramps; never climb ropes, ladders, and scaffolds; avoid concentrated exposure to
> hazards of heights; avoid concentrated exposure to vibration; and she is able to
> understand, remember, and carry out at least simple instructions.

(Tr.15).

The ALJ's assessment of plaintiff's *physical* residual functional capacity is supported by

substantial evidence on the record.  The ALJ found that the plaintiff's degenerative disc disease of

the thoracic and lumbar spine and obesity were severe physical impairments.  (Tr.14).  The ALJ

summarized the objective medical evidence regarding plaintiff's back impairment.  The ALJ stated

that x-rays of plaintiff's lumbar spine in July of 2004 revealed no evidence of fracture, significant

subluxation, or degenerative changes.  (Tr. 16).  The ALJ noted similar results for x-rays taken in

August of 2004 following a motor vehicle accident.  (Id.).  The ALJ stated that subsequent x-rays

of the plaintiff's lumbar spine revealed increased lordosis and mild degenerative joint disease at

L4-5, and that x-rays of the thoracic spine showed mild multilevel degenerative spondyloses.

(Id.).  The ALJ noted that an MRI of the lumbosacral spine on April 21, 2007 revealed mild disc

bulges at L4-5 and a left posterolateral T11-12 disc herniation.  (Id.).  The ALJ stated that on

June 14, 2007, Dr. Kenneth Smith found that plaintiff was alert, oriented and in no distress; she

could move all her extremities equally; her gait was steady and she had full strength; her sensation and motor were intact; and she did not have clubbing or edema in her extremities. (Tr. 345). Dr. Smith's assessment was lower back pain with no disc herniation seen on MRI. (Id.). Dr. Smith concluded that plaintiff did not have a surgical issue. (Id.).

The medical evidence found in the record and discussed by the ALJ supports the ALJ's physical residual functional capacity assessment. The objective medical evidence indicates that plaintiff is obese, but that plaintiff has never claimed that her obesity would prevent her from working. Although x-rays taken on April of 2007 revealed mild disc bulges and disc herniation, the record as a whole does not reveal a disabling back impairment. Plaintiff sought sporadic and minimal treatment for her back pain. The ALJ's finding that plaintiff was capable of performing light work is consistent with Dr. Smith's examination. There is no evidence in the record of any greater limitations than those assessed by the ALJ.

The ALJ's determination regarding plaintiff's *mental* residual functional capacity, however, is not supported by substantial evidence. The ALJ found that plaintiff was able to understand, remember, and carry out at least simple instructions. (Tr. 15). In support of this conclusion, the ALJ cites the fact that plaintiff experienced no psychiatric hospitalizations following those in April of 2005 and February of 2006. (Tr. 19). The ALJ also supported this assessment by arguing that plaintiff had received a GAF score of 65 in March of 2006, and that she appeared to function "fairly well" when on her medications. (Id.). The ALJ stated that plaintiff's decision to discontinue taking her medications in anticipation of becoming pregnant "suggests that her symptoms may not have been as troublesome and limiting as she alleged." (Id.).

First, the ALJ cites the fact that plaintiff experienced no psychiatric hospitalizations following the one in April of 2005 and February of 2006. (Tr. 19). While a lack of psychiatric hospitalizations is a relevant factor to be considered, it is not determinative of plaintiff's level of functioning. Plaintiff's more recent medical records indicate that plaintiff experienced mental setbacks, despite not rising to the level of severity requiring hospitalization. For example, on April 3, 2007, plaintiff reported worsening depression, severe mood swings, crying spells, anxiety, decreased appetite, and mood swings. (Tr. 381). On May 8, 2007, plaintiff reported depression that was the same or worse, and noted that her bipolar disorder had been worse over the past two to three months. (Tr. 379). On June 6, 2007, plaintiff noted that her mood was not so good, and that she was having increased crying spells. (Tr. 377-78). On August 2, 2007, plaintiff reported that her mood was "really bad," reported an increase in crying spells, and received a GAF of 45. (Tr. 374). On August 28, 2007, plaintiff reported increased irritability, picking at her face, crying spells in context of marital conflict, anxiety, forgetfulness, and anhedonia. (Tr. 372). This evidence indicates that plaintiff experienced significant psychiatric symptoms despite the fact that she was not hospitalized. As such, plaintiff's lack of recent hospitalizations does not support the ALJ's determination.

The ALJ next notes that plaintiff received a GAF score of 65 in March of 2006. (Tr. 19). The record, however, indicates that plaintiff's condition later deteriorated. Plaintiff received a GAF of 55 (May 2006), 50 (November 2006), 40 (April 2007), 40 (May 2007), 45 (June 2007), 50 (July 2007), and 45 (August 2007). (Tr. 336, 374, 376-79, 381, 394). The ALJ did not address these more recent GAF scores. As such, the fact that plaintiff received a GAF score of 65

in March of 2006 does not support the ALJ's determination regarding plaintiff's mental ability to function in the workplace.

The ALJ found that when plaintiff is on her medication, she appears to be fairly functional. (Tr. 19). This conclusion is not supported by the record. The ALJ did not mention specific medications used during her treatment that he views as effective. Presumably, Lithium is one of the medications he views as effective, as he references plaintiff's decision for forego taking a medication in anticipation of becoming pregnant. (Id.). However, during visits with Dr. Rao on April 3, May 8, June 6, August 2, and August 28 of 2007, there is no indication that plaintiff was non-compliant with her Lithium, yet she still appeared to exhibit significant symptoms. (Tr. 372, 374, 377-79, 381). Plaintiff has been prescribed numerous other medications over the course of her treatment for bipolar disorder and depression including Prozac, Abilify, Wellbutrin, and Lamictal. The ALJ does not provide specific instances in support of his argument that when plaintiff is compliant with medications she is "fairly functional." As previously discussed, the most recent medical records indicate the opposite. Prozac was continually prescribed while under the care of Dr. Rao, and plaintiff adhered to this regimen. (Tr. 372-385). Nevertheless, even with increases in dosage, plaintiff received GAF scores of 55-60 in November of 2006, 40 in May of 2007, and 45 in June of 2007. (Tr. 394, 377-79). These scores do no support the ALJ's conclusion that where plaintiff is compliant with her medication, she is fairly functional.

The ALJ's decision inexplicably omits significant discussion of plaintiff's treatment by Dr. Rao from November 2006 to September of 2007. (Tr. 372-382). The ALJ provides merely a cursory review of Dr. Rao's treatment by summarizing plaintiff's initial examination on November

16, 2006. (Tr. 18-19). Although plaintiff saw Dr. Rao approximately monthly through August 2007, the ALJ does not discuss any of these records. This evidence is particularly relevant as it represents the most recent records of treatment by a treating psychiatrist, and much of it contradicts the ALJ's assessment. As such, the ALJ erred in failing to discuss the records of Dr. Rao.

The ALJ also failed to discuss the records of plaintiff's counselor, Ms. Sadlo. Plaintiff saw Ms. Sadlo regularly for counseling, upon the recommendation of Dr. Rao. In a letter dated September 27, 2007, Ms. Sadlo stated that she had arrived at the conclusion through treatment that plaintiff was unable to maintain full-time employment. (Tr. 412). Ms. Sadlo stated that plaintiff suffered from bouts of severe depression and anxiety, which were directly related to her bipolar disorder. (Id.). She indicated that plaintiff was employed briefly in 2006, but was unable to manage the requirements and was required to resign. (Id.). The ALJ did not discuss Ms. Sadlo's opinion. Although the opinion of Ms. Sadlo is not entitled to controlling weight because Ms. Sadlo is not a proper medical source, her opinion is relevant in determining the severity of plaintiff's mental impairments. Significantly, Ms. Sadlo's letter is the only opinion in the record regarding plaintiff's ability to function in the workplace. As such, the ALJ erred in failing to discuss Ms. Sadlo's opinion.

In addition to failing to provide adequate consideration of all relevant evidence on the record, the ALJ also erred by not fully developing the record regarding plaintiff's mental impairments. There is no opinion in the record from a physician addressing plaintiff's mental ability to function in the workplace. An ALJ has a duty to fully develop the record, particularly where a claimant is not represented by counsel. See Driggins v. Harris, 657 F.2d 187, 188 (8th

-38-

Cir. 1981). This inquiry is limited to whether the claimant was prejudiced or unfairly treated by the ALJ's development of the record. See Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993). It has been held to be a reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision. See Haley v. Massanari, 258 F.3d 742, 749 (8th Cir. 2001). However, an "ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1999) (quoting Nabor v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)).

In this case, there is no evidence in the record, other than the opinion of Ms. Sadlo, addressing plaintiff's mental ability to function in the workplace. Without such medical evidence, the ALJ cannot make an informed decision about plaintiff's functional restrictions. As explained above, due to this omission, the ALJ has assessed a mental residual functional capacity which is not based on substantial medical evidence in the record. The undersigned therefore finds that plaintiff has been prejudiced by the ALJ's failure to obtain further medical evidence addressing plaintiff's functional restrictions.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to consider the records of Dr. Rao and Ms. Sadlo, formulate a new mental residual functional capacity for plaintiff based on the medical evidence in the record, and to order, if needed, additional medical information addressing plaintiff's mental ability to function in the workplace.

**2.     Demands of Past Relevant Work**

Plaintiff also argues that the ALJ erred in failing to properly analyze the requirements of plaintiff's past relevant work. Specifically, plaintiff argues that the ALJ erred by not making findings regarding the demands of plaintiff's past relevant work. Plaintiff contends that the ALJ failed to cite in his decision the skill or exertional levels of plaintiff's past work and that the vocational expert testimony referenced by the ALJ in his opinion failed to address the requirements of plaintiff's past work. Plaintiff argues that the vocational expert testified that his testimony was consistent with the Dictionary of Occupational Titles (DOT) but that neither the ALJ's decision nor the vocational expert's testimony referred to a specific job title in the DOT.

An ALL has a duty to "fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before he determines that she is able to perform her past relevant work." Sells v. Shalala, 48 F.3d 1044, 1046 (8th Cir. 1995) (quoting Nimick v. Secretary of Health and Human Serv., 887 F.2d 864, 866 (8th Cir. 1989)). "A conclusory determination that the claimant can perform past work, without these findings, does not constitute substantial evidence that the claimant is able to return to his [or her] past work." Sells, 48 F.3d at 1046 (quoting Groeper v. Sullivan, 932 F.2d 1234, 1239 (8th Cir. 1991)). An ALJ may properly describe the demands of a plaintiff's past relevant work by reference to job descriptions in the Dictionary of Occupational Titles. See Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir. 1999).

The undersigned finds that the ALJ did not properly consider the demands of plaintiff's past relevant work. As described above, the ALJ first assessed an erroneous mental residual functional capacity and then made the following findings:

The claimant had past relevant work as a cashier. The vocational expert testified that an individual with the limitations found in this decision could perform the claimant's past relevant work as a cashier. He also stated that his testimony was consistent with the Dictionary of Occupational Titles and Selected Characteristics of Occupations. The undersigned finds this testimony credible and consistent with the evidence as whole.

(Tr. 21).

On these grounds, the ALJ determined that plaintiff was able to perform past relevant work. (Id.). The ALJ made no specific findings regarding plaintiff's past relevant work, nor did he provide specific reference to job descriptions in the DOT. The DOT lists numerous cashier positions with different job descriptions for each. Mere testimony by the vocational expert that his statements are consistent with the DOT is not sufficient to meet the requirements of describing past relevant work. The ALJ's decision leaves to speculation which of these job descriptions reflects plaintiff's past relevant work. See Pfitzner, 169 F.3d at 569.

As discussed above, the ALJ formulated a residual functional capacity that was not supported by substantial evidence. Based on this erroneous residual functional capacity, he then found that plaintiff could perform her past relevant work as a cashier. In making this determination, the ALJ failed to make explicit findings regarding the demands of plaintiff's past relevant work. Accordingly, the undersigned recommends that the decision of the Commissioner be reversed and this matter be remanded to the ALJ in order for the ALJ to formulate a new mental residual functional capacity based on the medical evidence in the record, and to order, if needed, additional medical information addressing plaintiff's mental ability to function in the workplace; and to make explicit findings regarding the demands of plaintiff's past relevant work and compare those demands with plaintiff's new residual functional capacity.

**RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with the Report and Recommendation and further that the court not retain jurisdiction of this matter.

The parties are advised that they have eleven (11) day in which to file written objection to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this  28th  day of August, 2009.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE